*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-2098**

Craig Ecker, petitioner,
Appellant,

vs.

Commissioner of Public Safety,
Respondent

**Filed June 29, 2015
Affirmed
Worke, Judge**

Otter Tail County District Court
File No. 56-CV-14-2458, 56-CR-14-2323

Christopher J. Cadem, Fergus Falls, Minnesota (for appellant)

Lori Swanson, Attorney General, Rory C. Mattson, Assistant Attorney General, Joan Marie Eichhorst, Assistant Attorney General, St. Paul, Minnesota

Considered and decided by Worke, Presiding Judge; Hudson, Judge; and Chutich, Judge.

## UNPUBLISHED OPINION

**WORKE**, Judge

Appellant challenges the revocation of his driver's license, arguing that he did not have physical control of the vehicle and that no temporal connection was shown to exist between his intoxication and driving. We affirm.

## D E C I S I O N

*Physical control*

Following appellant Craig Ecker's driving-while-impaired (DWI) arrest, respondent Commissioner of Public Safety revoked his driver's license. The district court sustained the revocation. Ecker argues that the district court erred in concluding that he was in physical control of the vehicle while under the influence.

The commissioner must revoke a person's driver's license if the person was in physical control of a vehicle and had an alcohol concentration of .08 or higher. Minn. Stat. § 169A.52, subd. 4(a) (2014). If a driver asserts that he was not in physical control of the vehicle, the commissioner must prove that he was in control by a fair preponderance of the evidence. *Llona v. Comm'r of Pub. Safety*, 389 N.W.2d 210, 212 (Minn. App. 1986).

"Whether a person is in physical control of a motor vehicle for purposes of the implied-consent law is a mixed question of law and fact." *Snyder v. Comm'r of Pub. Safety*, 744 N.W.2d 19, 21-22 (Minn. App. 2008). The district court's findings of fact will not be set aside unless clearly erroneous. *Id.* at 22. Findings of fact are clearly erroneous when they are "manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *Schulz v. Comm'r of Pub. Safety*, 760 N.W.2d 331, 333 (Minn. App. 2009) (quotation omitted). When the evidence supporting the district court's factual findings is entirely oral testimony, we will not disturb the findings except in extraordinary circumstances. *Hunt v. Comm'r of Pub. Safety*, 356 N.W.2d 801, 803 (Minn. App. 1984). After the facts are established, we review de novo

2

whether they demonstrate physical control. *Snyder*, 744 N.W.2d at 22. We will overturn conclusions of law "only upon a determination that the [district] court has erroneously construed and applied the law to the facts of the case." *Dehn v. Comm'r of Pub. Safety*, 394 N.W.2d 272, 273 (Minn. App. 1986).

"The term 'physical control' is more comprehensive than either 'drive' or 'operate.'" *State v. Starfield*, 481 N.W.2d 834, 836 (Minn. 1992). The term is "given the broadest possible effect . . . to deter inebriated persons from getting into vehicles except as passengers." *Id.* (quotation omitted). "[A] person is in physical control of a vehicle if he has the means to initiate any movement of that vehicle, and he is in close proximity to the operating controls of the vehicle." *State v. Fleck*, 777 N.W.2d 233, 236 (Minn. 2010). Because it is the overall situation that is determinative, *Starfield*, 481 N.W.2d at 838, courts consider a number of factors when resolving whether a person is in physical control of a vehicle, including "the person's location in proximity to the vehicle; the location of the keys; whether the person was a passenger in the vehicle; who owned the vehicle; and the vehicle's operability." *Fleck*, 777 N.W.2d at 236.

Ecker argues that he was not in physical control because the engine was off and the keys were removed and never located. In *Sens v. Comm'r of Pub. Safety*, officers received a call in the early morning that a person was in a vehicle parked on the street. 399 N.W.2d 602, 603 (Minn. App. 1987). An officer shined a spotlight into the vehicle and observed Sens lying on the front seat. *Id.* Sens woke up when directed and exited the vehicle. *Id.* at 604. The officer observed keys on the front seat. *Id.* Sens displayed indicia of intoxication and the officer placed him under arrest for DWI, but Sens told the

3

officer that he could not arrest him because there was no ignition key. *Id.* The officer tried the keys he observed, but none fit the ignition. *Id.* While waiting for a tow-truck, the officer found keys in the rear of the vehicle and one of them fit the ignition. *Id.* There was no mechanical problem with the vehicle. *Id.*

This court determined that the fact that the keys were not discovered until after the arrest was not dispositive because physical control does not depend on the location of the keys. *Id.* at 605. This court concluded that Sens was in physical control because he was parked several miles from where he was living and could have driven home at any moment. *Id.*

Sens relied in part on *Ledin v. Comm'r of Pub. Safety*, in which this court held that the officer had probable cause to believe that the driver was in physical control of his vehicle while under the influence. 393 N.W.2d 433, 435 (Minn. App. 1986). In that case, an officer responded to a report of a person passed out in a vehicle, and the officer found Ledin lying on the front seat. *Id.* at 434. The officer woke Ledin, who displayed indicia of intoxication. *Id.* Ledin was arrested and his driver's license was revoked. *Id.*

Ledin argued that he was not in possession of the keys to his car. *Id.* at 435. The officer testified that at the time of the arrest, he had not seen the keys; he was subsequently given the keys by another officer who inventoried the car. *Id.* This court held that there is "no requirement that the [c]ommissioner prove . . . that the driver had possession of his keys." *Id.* This court concluded that, under the totality of the circumstances, and giving deference to the officer's ability to make inferences and deductions which could elude an untrained person, the officer had probable cause to

4

believe that Ledin was in physical control of his vehicle while under the influence. *Id.* This court considered that the officer found Ledin sleeping in his vehicle, saw indicia of intoxication when he woke him, and could have reasonably inferred that Ledin drove to that location. *Id.*

Here, Sergeant Connor West testified that on August 16, 2014, around 7:29 p.m., he responded to a call from a grocery store employee to conduct a welfare check on an individual in a vehicle as a "possible slumper." The officer made contact with Ecker. The vehicle was not running and the officer did not see any keys. Ecker stated that he had driven to a food stand to get corn for dinner that night, but it was closed, so he drove to the grocery store where the officer found him. While speaking with Ecker, the officer detected the strong odor of an alcoholic beverage, and noticed that Ecker's eyes were bloodshot and watery and his responses seemed slow. Ecker admitted that he had something to drink.

The district court concluded that Ecker was in physical control of the vehicle because he was in a parked vehicle, in close proximity to the operating controls of the vehicle, and admitted that he had been driving. In addition, no other person was present who could have been driving. These circumstances support the district court's conclusion that Ecker was in physical control of his vehicle while under the influence.

### Temporal connection

Ecker also argues that the district court erred by concluding that the commissioner showed that the officer had probable cause to believe that Ecker was driving while under

the influence because there was not a sufficient temporal connection between Ecker's driving and his intoxication.

> A determination of probable cause is a mixed question of fact and of law. After the facts are determined, this court must apply the law to determine if probable cause existed. This court does not review probable cause determinations de novo, instead, we determine if the police officer had a substantial basis for concluding that probable cause existed at the time of invoking the implied consent law.

*Groe v. Comm'r of Pub. Safety*, 615 N.W.2d 837, 840 (Minn. App. 2000) (citations and quotation omitted), *review denied* (Minn. Sept. 13, 2000). We evaluate probable cause under the totality of the circumstances, from the arresting officer's point of view, giving deference to the officer's experience and judgment. *DeLong v. Comm'r of Pub. Safety*, 386 N.W.2d 296, 298 (Minn. App. 1986), *review denied* (Minn. June 13, 1986).

An officer is not required to establish a temporal connection between the driving and the belief that probable cause exists to invoke the implied-consent law. *Graham v. Comm'r of Pub. Safety*, 374 N.W.2d 809, 811 (Minn. App. 1985). But "there must be a time frame established showing a connection between drinking and driving." *DeLong*, 386 N.W.2d at 298.

Ecker relies on *Dietrich v. Comm'r of Pub. Safety*, in which this court affirmed a district court determination that the evidence failed to link the time of a collision to the time when the driver was determined to be under the influence. 363 N.W.2d 801, 803 (Minn. App. 1985). In that case, Dietrich hit a parked trailer. *Id.* at 802. Witnesses identified Dietrich as the driver, who had left the accident scene, but did not indicate whether Dietrich appeared to be under the influence. *Id.* The officer went to Dietrich's

6

home; Dietrich showed signs of intoxication, admitted that he had been drinking, failed field sobriety tests, and registered a .10 alcohol content on a breath test. *Id.* The officer did not testify about when the accident occurred; he stated only that he was on duty around 9:19 p.m. and invoked the implied-consent advisory at 10:24 p.m. *Id.*

This court agreed with the district court that the evidence established that Dietrich was driving the car involved in the collision and that he was under the influence of alcohol at the time the officer observed him. *Id.* at 803. But the evidence failed to establish the connection between the two events. *Id.* This court stated that the time the officer was on duty did not establish when the accident occurred or when Dietrich had been driving; that Dietrich was later found to be under the influence established a sequence of events, but provided no time frame. *Id.*

Here, Sergeant West testified that the call from the grocery store employee was "dispatched at approximately 7:29 p.m. [and he] arrived shortly thereafter." Ecker stated that he had driven to the food stand, but it was closed, so he drove to the grocery store where the officer found him. The officer observed indicia of intoxication, and Ecker admitted that he had something to drink. Ecker performed field sobriety tests poorly and his preliminary-breath-test result was .281. The officer placed Ecker under arrest for DWI and read the implied-consent advisory. Ecker agreed to take a breath test, and at 8:20 p.m. Ecker's reported alcohol content was .28.

Unlike the officer in *Dietrich*, the officer here testified that he arrived at the grocery store shortly after 7:29 p.m. and made contact with Ecker, who admitted that he been drinking and stated that he had driven to the store to get something for dinner that

7

night. The breath test was administered less than an hour later. The officer's testimony established a sufficient temporal connection between the time Ecker was driving and the time when he was determined to be under the influence.

*Findings of fact*

Finally, Ecker argues that the district court's findings of fact underlying its legal conclusions were clearly erroneous. He specifically challenges the following findings: (1) there was "no evidence that [Ecker] intended to cease operating his vehicle and leave it at [the grocery store]," and (2) "[w]hen Sergeant West observed [Ecker], he was still seated in his vehicle and in an impaired state."

Ecker argues that the absence of keys demonstrates intent to cease operating the vehicle. But the officer testified that Ecker stated that he had driven to the food stand to get corn for dinner that night. It was approximately 7:30 p.m. The time of day, combined with the act of getting something for dinner that night shows that Ecker did not intend to leave his vehicle at the grocery store but, instead, intended to return home. Thus, this finding is not clearly erroneous. *See Schulz*, 760 N.W.2d at 333.

Ecker suggests that the evidence was insufficient to show that he remained in his vehicle after arriving at the grocery store. He claims that the late hour, the missing keys, and his extremely high level of intoxication indicate that he walked to a liquor store or to a local establishment serving alcohol located near the grocery store and returned without his keys. First, the record before this court is devoid of anything about a liquor store or any establishment serving alcohol located near the grocery store. Second, the record before this court is devoid of any asserted post-driving alcohol consumption. Finally, the

8

district court's finding that "[w]hen Sergeant West observed [Ecker], he was still seated in his vehicle and in an impaired state," was likely referring to West testifying that he received a call that an individual—a "possible slumper"—was in his vehicle, and when the officer arrived and approached the vehicle, Ecker was still in the vehicle. Further support for this reasoning is the district court's contrast of *Dietrich*, in which the driver was not found at the scene, and the officer had to travel to the driver's home to locate him. *See* 363 N.W.2d at 802. This finding is not clearly erroneous. *See Schulz*, 760 N.W.2d at 333.

**Affirmed.**